JS 44 (Rev. 03/24) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS
JEMCO Enterprises, LLC

**(b)** County of Residence of First Listed Plaintiff: Acadia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Daniel J. Phillips
100 E. Vermilion Street, Suite 400, Lafayette, LA 70501

### DEFENDANTS
Wildcards Productions, LLC;
Jean-Claude Locas

County of Residence of First Listed Defendant: Lafayette
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*
- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [x] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**
PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**PRISONER PETITIONS**
Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty
Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [x] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

### V. ORIGIN *(Place an "X" in One Box Only)*
- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Lanham Act, 17 U.S.C. § 101, et seq

Brief description of cause:
Dispute over rights to intellectual property

### VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ Unknown

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

### VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE _____ DOCKET NUMBER _____

DATE: 05/29/2025
SIGNATURE OF ATTORNEY OF RECORD: */s/ signature/*

**FOR OFFICE USE ONLY**
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **JEMCO ENTERPRISES, LLC**<br>    Plaintiffs,<br>v.<br><br>**WILDCARDS PRODUCTION, LLC,<br>JEAN-CLAUDE LOCAS, MATTHEW<br>GARTH, and JAMIE WARD**<br>    Defendants. | No. _____<br><br>JUDGE<br><br>MAGISTRATE JUDGE |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## VERIFIED COMPLAINT FOR PERMANENT INJUNCTION AND DAMAGES

**NOW COMES** Petitioner, JEMCO Enterprises, LLC. ("JEMCO"), who petitions for permanent injunctive relief and damages:

### PARTIES

1. Petitioner, JEMCO Enterprises, LLC, is a Louisiana limited liability company authorized to do and doing business in the state of Louisiana.

2. Defendant Wildcards Productions, LLC ("Wildcards") is a Louisiana limited liability company, which on information and belief is authorized to do and doing business in the state of Louisiana.

3. Defendant Jean-Claude Locas is an individual residing in the state of Louisiana.

4. Defendant Matthew Garth is an individual residing in the state of Louisiana.

5. Defendant Jamie Ward is an individual residing in the state of Louisiana.

### JURISDICTION AND VENUE

6. This Court has jurisdiction over this proceeding under 28 U.S.C. § 1331 and 28 U.S.C. § 1338 because some of the claims in this matter involve copyright disputes, which arise under the Lanham Act 17 U.S.C. § 101, *et seq.* This Court has supplemental jurisdiction under

1

28 U.S.C. § 1367 over JEMCO's remaining claims arising under state law because those claims are so related to the claims arising under the Lanham Act that they form part of the same case or controversy.

7. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the acts and omissions complained of by Petitioner occurred in this district and division, the individual Defendants reside in this district and division, and JEMCO has sustained damages in this district and division.

## FACTUAL ALLEGATIONS

8. JEMCO has been engaged in the business of providing professional wrestling training and shows since JEMCO was organized on February 26, 2021. Its members are Joey Comeaux and his wife of 38 years, Melissa Comeaux.

9. Comeaux, who is originally from Acadia Parish, Louisiana, is a former professional wrestler, who wrestled under the name "Gorgeous Joey Jackson" in shows around the United States before retiring and returning to Acadia Parish. Comeaux has remained active in the professional wrestling industry by training aspiring professional wrestlers. Altogether, Comeaux has over 40 years' experience in the professional wrestling industry.

10. JEMCO does business under the trade name "Louisiana Wrestling Alliance" ("LWA"), which it registered as a trade name with the Louisiana Secretary of State on August 16, 2021. Exhibit A. It initially operated a facility for training professional wrestlers before adding classes and camps for persons interested in training for professional wrestling as its business grew. After a few years in business, it began hosting and promoting professional wrestling shows primarily in the Southwest Acadiana Region.

11. JEMCO's training facility and principal place of business were located in Crowley, Louisiana, until March 2024, when it moved its facility and principal place of business to their current location in Lafayette, Louisiana, where it has remained.

12. Defendants Ward and Garth represent themselves as filmmakers. After learning of Comeaux's history in professional wrestling, they contacted Comeaux sometime in late 2023 or early 2024, proposing to produce a documentary on Comeaux's career in the wrestling industry, and Comeaux expressed interest in their proposal.

13. Soon thereafter, Ward, Garth, and Comeaux met at JEMCO's training facility to discuss the proposed documentary, and they decided to move forward with it. Garth, who also creates graphic designs, also presented a rough draft of a new LWA logo to Comeaux at that meeting.

14. Several days later, Comeaux contacted Garth by telephone. Comeaux indicated that he approved the new LWA logo, and he asked Garth create a final draft of same.

15. After Garth presented the final draft of the LWA logo, Comeaux stated that he planned to register it as a trademark of JEMCO, and Garth did not object. Comeaux also offered to compensate Garth for the logo, but Garth declined. Rather, Garth stated that he was happy to help. After Garth delivered the final logo to Comeaux in early 2024, JEMCO began using it.

16. JEMCO later registered the LWA logo as a trademark with the Louisiana Secretary of State on January 24, 2025. Exhibit B.

17. Production of the documentary on Comeaux's career began in early 2024. Ward and Garth began operating through Wildcards, which they had reinstated with the Secretary of State after it had become inactive.

3

18. Locas also became involved with Wildcards. Upon information and belief, Ward, Garth, and Locas are all members of Wildcards.

19. Although Garth is a member and/or agent of Wildcards, on information and belief Garth designed the new LWA logo in his individual capacity rather than as member, agent, or employee of Wildcards.

20. All Defendants were aware of JEMCO's use of the logo, but none offered any objection. To the contrary, when Ms. Comeaux emailed Garth on January 28, 2025, asking for copies of the logo in a higher resolution that could be reproduced on merchandise, Garth forwarded them to her, responding: "I am the one who actually originally designed and created the logo. I do not have an Adobe Illustrator subscription anymore but I have some Hi rez files saved. I will send over what I have." Exhibit C. JEMCO as well as Defendants posted the logo on JEMCO's social media pages, produced merchandise such as shirts and caps with the logo on them, created marketing materials such as flyers and posters with the logo, and displayed it on equipment such as the LWA wrestling ring skirt.

21. Thus, Garth and Defendants granted JEMCO, at minimum, a nonexclusive license to use the LWA logo under the Lanham Act.

22. Ward also offered to design a website for the LWA, and Comeaux accepted the offer. Ward did not ask for compensation for designing it.

23. On January 28, 2025 the completed documentary, which is approximately ten minutes long, was presented for the first time to the general public at the Cite de Arts during the Cinema on the Bayou Film Festival.

24. Following the airing of the documentary, JEMCO scheduled and began preparing for its first wrestling show, which would be held on March 8, 2025. Ward and Locas expressed interest in filming JEMCO's wrestling shows.

25. JEMCO began promoting the March 8, 2025 show. Based on feedback from promotional efforts, JEMCO expected that the show would be successful.

26. Ward hired additional personnel including camera operators, photographers, and backstage commentators to film the show. Although Comeaux repeatedly questioned Ward about costs for the additional personnel, Ward declined to disclose the costs, nor did he ask JEMCO to pay any of those costs. Rather, Ward stated that he was "doing him a favor."

27. The March 8, 2025 show was indeed a success, as it sold out.

28. Defendants eventually produced various short videos that they provided to JEMCO for marketing purposes, thereby giving JEMCO a nonexclusive right to use those videos under the Lanham Act. JEMCO accordingly posted some of those videos on its social media platforms.

29. Although there was no business agreement between Defendants and JEMCO, Defendants continued to express interest in filming JEMCO's shows, and JEMCO allowed Defendants to continue filming.

30. Following the March 8, 2025 show, JEMCO was approached by the Cajundome to host a show on May 31, 2025, during the Cajun Heartland State Fair. The scale of that show, and its exposure, would be much larger than JEMCO's prior shows. JEMCO expressed interest in the Cajundome's proposal, and Defendants expressed interest in filming that show.

31. The Cajundome required JEMCO to sign a contract for that show.

32. JEMCO's next event was scheduled for April 5, 2025. Around that time, Locas began to assert more control over Defendants' work filming JEMCO's shows. Locas also began attending meetings related to JEMCO's shows and asserting himself in discussions concerning the shows, whereas all discussions were previously between JEMCO and Ward.

33. Unfortunately, the relationship between JEMCO and Defendants began to sour after Locas began asserting more control.

34. During the April 5, 2025 show, Defendants, on Locas' insistence and without consulting JEMCO, set up extremely bright lighting that had not been used at the prior show. JEMCO received complaints from audience members concerning the additional lighting that was used for the filming. When asked why so many lights, Locas belligerently responded that "it is the physics," and he ignored the complaints.

35. Nevertheless, the April 5, 2025 show was also sold out. It provided significant momentum heading into the event with the Cajundome.

36. Just before the April 5, 2025 show, the Cajundome sent JEMCO a draft of a contract for the Cajundome show, and Comeaux and the Cajundome arranged a meeting to further discuss.

37. Comeaux could not attend that meeting due to a death in the family, so he asked Defendants to attend for him, and they did. When Comeaux received an updated draft of the contract, it included approximately $25,000.00 in additional costs for items such as video board rental, additional sound equipment, additional lighting, and rental for additional space at the Cajundome convention center. Ward and Locas, without consulting JEMCO, had asked for those items to be included in the contract.

6

38. JEMCO asked the Cajundome to remove those additional items from the contract because JEMCO did not believe that they were necessary, nor did JEMCO want to risk exposure to those costs. The Cajundome agreed to remove them, and the parties later signed a contract with an estimated $2,500.00 of production equipment rather than $25,000.00 that Locas had asked for.

39. That incident increased the tension between JEMCO and Defendants because Ward and Locas did not agree with removing the extra equipment.

40. On Thursday, April 10, 2025, Ward and Locas appeared at JEMCO's training facility without notice. Ward and Locas demanded that Comeaux establish another LLC for the LWA business – without including his wife as a member – and assign 50% of its membership interest to Ward and Locas. The meeting became heated because Comeaux was shocked that he would be asked to give away half of his business who were merely filing and producing videos of the LWA, and to exclude his wife's involvement in future business. Comeaux refused the demand, but he agreed to consider possibilities for other arrangements with Defendants. The parties agreed to meet again on April 17, 2025.

41. But on April 14, 2025, which was after JEMCO had signed the contract with the Cajundome for the upcoming show, Ward and Locas approached the Cajundome attempting to intervene in that contract. The Cajundome representative, Casey Boudreaux White, declined to entertain their efforts because the contract was already signed. She contacted Comeaux about the incident, asking him if JEMCO wanted to continue with the planned show.

42. At that time, Comeaux decided that JEMCO would move forward without Defendants due to their attempts to interfere with JEMCO's business, so he advised Ms. White that JEMCO wanted to proceed with the show as long as Defendants were not involved.

43. Shortly thereafter, Ward, who had credentials to log into JEMCO's website (www.louisianawrestlingalliance.com), took JEMCO's website down without notice. JEMCO immediately demanded that Ward restore the website and turn over control of the website to JEMCO. Ward eventually complied, but the incident caused damage to JEMCO's business and credibility.

44. Defendants then interfered with JEMCO's social media presence. On May 17, 2025, JEMCO received numerous notifications from Facebook stating that it had removed several posts from JEMCO's LWA page. As grounds, the notices stated that Facebook had suspended the LWA page due to complaints that some of the posts on it infringed on another party's intellectual property. JEMCO appealed the suspension, but it still has not yet received a response. In the meantime, JEMCO was able to restore its Facebook page but using its former LWA logo, and without the videos from its prior shows.

45. On May 20, 2025, JEMCO received a notification that its Instagram account had been suspended due to complaints of infringement on another party's intellectual property. JEMCO also appealed that suspension, but the page has not been restored to date.

46. JEMCO determined that the complaints came from Defendants, who claimed that they owned the LWA logo and videos that JEMCO had posted on those pages.

47. Although those pages displayed the LWA logo and videos produced by Defendants, JEMCO at minimum had a nonexclusive right to use that intellectual property that JEMCO alleges was nonrevocable, but even if it was revocable, Defendants had not revoked it – and they still have not to this day.

48. Further, Defendants posted messages on their own social media pages that were false and disparaging toward JEMCO, its members, and its business.

49. As a result, JEMCO's business and credibility have been, and continue to be, damaged because it has been unable to use those pages to connect with its followers, advertise its upcoming show at the Cajundome, or generate interest in its business.

50. In an effort to resolve the issues, JEMCO sent a Cease and Desist letter to Wildcards Productions, LLC and its members on May 20, 2025, demanding that Defendants cease slandering and interfering with its business practices, and withdraw the complaints to Facebook and Instagram so that those pages can be restored. Exhibit D. JEMCO further demanded that any and all false claims with social media be withdrawn so that its pages could be restored.

51. Defendants not only refused to comply with the Cease and Desist letter, they also sent their own letter to JEMCO demanding that it cease all "unauthorized use" of the LWA logo; halt production and sale of merchandise, promotional material, and advertising content with the LWA logo; and remove all videos containing content that Wildcards allegedly created or licensed. Exhibit E. Nothing in that letter terminates any nonexclusive license to use the intellectual property that Defendants claim is theirs.

52. The timing of Defendants' interference with JEMCO's business through falsely complaining about intellectual property and sending its cease and desist letter is no accident, as Defendants were well-aware of the upcoming Cajundome show, and they are aware that JEMCO had produced merchandise, marketing materials, and equipment with the LWA logo. Defendants' lack of any attempt to resolve any intellectual property issues with JEMCO before resorting to complaints resulting in the suspension of JEMCO's LWA social media, and the cease and desist letter coming in the days before the Cajundome show after JEMCO had

9

produced merchandise, marketing materials, and equipment with the LWA logo clearly intended to maliciously interfere with JEMCO's business.

53. On information and belief, Defendants will continue to maliciously interfere with JEMCO's business, and they may attempt to disrupt JEMCO's upcoming Cajundome show, which is set for May 31, 2025.

## CAUSES OF ACTION AND CLAIMS FOR RELIEF

## COUNT 1 – INJUNCTIVE RELIEF

54. JEMCO is entitled to a permanent injunction enjoining Defendants Wildcards, Ward, Garth, and Locas, along with their agents, affiliates, representatives, and anyone associated with them, from interfering with JEMCO's business, complaining that JEMCO's use of the LWA logo infringes on Defendants' intellectual property rights, attempting to interfere with JEMCO's social media pages, attempting to interfere with JEMCO's efforts to market merchandise with the LWA logo, and attempting to interfere with JEMCO's use of equipment with the LWA logo on it, because JEMCO has, at minimum, a nonexclusive right to use the LWA logo.

55. Under federal law, a nonexclusive license" to use intellectual property "may be granted orally, or may even be implied from conduct" *Lulirama Ltd., Inc. v. Axcess Broad. Services, Inc.*, 128 F.3d 872, 879 (5th Cir. 1997).

56. An "implied nonexclusive license" arises when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work," or when the "totality of the parties' conduct indicates an intent to grant such permission" to use intellectual property. *Id*. Consent for an implied license may take

the form of permission or lack of objection. *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 500 (5th Cir. 2012).

57. JEMCO had a nonexclusive license to use the LWA logo under either measure. First, Garth offered to create the LWA logo, and JEMCO accepted the offer. Second, Garth created the LWA logo and delivered it to JEMCO, as evidenced the email attached as Exhibit _ and the fact that JEMCO used the logo extensively on its social media, website, merchandise, equipment, and promotional materials. Third, Garth obviously intended that JEMCO copy and distribute the LWA logo, as evidenced by the email attached as Exhibit C and the fact that Garth was well-aware of JEMCO's extensive use of the LWA logo. The totality of same circumstances shows that Garth intended to grant JEMCO the right to use the LWA logo.

58. JEMCO's right to use the LWA logo is irrevocable because JEMCO offered Garth consideration for it, and Defendants received consideration because Comeaux allowed Defendants to produce a documentary about Comeaux's career, and JEMCO allowed Defendants to film and produce videos about its shows.

59. Under federal law, a nonexclusive license to use intellectual property is irrevocable "if supported by consideration." *Lulirama,* 128 F.3d at 882.

60. Here, Garth received consideration for the LWA logo because Comeaux offered to pay Garth for the logo. Although Garth refused to accept payment, the consideration element is still satisfied by the offer. Further, Garth and Defendants received consideration for the LWA logo because they were allowed to produce a documentary on Comeaux's career and film the LWA shows, which is Defendants' main business. Thus, the nonexclusive license to JEMCO for the LWA logo is irrevocable.

61. Alternatively, even if the nonexclusive license to use the LWA logo were revocable, JEMCO would still have the right to use it because neither Garth nor any other Defendant revoked that license. None of the Defendants bothered to contact JEMCO before submitting allegations to Facebook and Instagram that JEMCO's use of the logo infringed on Defendants' intellectual property rights. Defendants' cease and desist letter also does not revoke any license because nothing in it states that any Defendant is revoking that license. To the contrary, it merely demands that JEMCO cease the "unauthorized use" of the LWA logo, but JEMCO's use was authorized through the implied nonexclusive license to use it. Exhibit _.

62. Because JEMCO has an active and valid license to use the LWA logo, Defendants have no right to prevent that use, nor do they have a right to interfere with JEMCO's business based on that use. Therefore, JEMCO asks that this Court issue a permanent injunction enjoining Defendants Wildcards, Ward, Garth, and Locas, along with their agents, affiliates, representatives, and anyone associated with them, from interfering with JEMCO's business, complaining that JEMCO's use of the LWA logo infringes on Defendants' intellectual property rights, attempting to interfere with JEMCO's social media pages, attempting to interfere with JEMCO's efforts to market merchandise with the LWA logo, and attempting to interfere with JEMCO's use of equipment with the LWA logo on it.

## COUNT 2 – INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

63. Defendants have intentionally and maliciously interfered with JEMCO's business relations by taking actions that are harmful to its business, including but not limited to taking down JEMCO's LWA website without notice, much less authorization, from JEMCO; causing JEMCO's LWA Facebook page to be suspended based on improper and false complaints of copyright infringement; and causing JEMCO's LWA Instagram page to be suspended based on improper and false complaints of copyright infringement.

64. Defendants' actions were malicious because they were designed to harm JEMCO's business after Comeaux refused Defendants' demand for 50% of JEMCO's business by forming a new LLC in which Defendants Ward and Locas received 50% of the membership interest. Defendants also timed their actions to cause harm to JEMCO because Defendants knew that the Cajundome show was upcoming at the time of their actions; that JEMCO had already produced merchandise, promotional materials, and equipment with the LWA logo on it; that JEMCO would not be able to sell that merchandise or use the equipment and promotional materials if it gave into Defendants' demands, which would have forced JEMCO to incur costs to reproduce all of those products and equipment without the LWA logo, and would have forced JEMCO to lose the ability to recoup costs for the merchandise that it had already produced with the LWA logo on it.

65. Defendants also caused harm to JEMCO's business by posting content on social media that was falsely disparaging toward JEMCO, Joey Comeaux, and Melissa Comeaux.

66. The dispute over the LWA logo could have been resolved reasonably and without Court intervention had Defendants attempted to work with JEMCO to resolve the issue, but Defendants chose to act with cowardice by wrongly harming JEMCO through computer screens.

13

67. JEMCO's business has sustained, and will continue to sustain, damages due to Defendants' malicious interference, including loss of profits, loss of business opportunities, loss of credibility, and loss of goodwill.

68. JEMCO asks for judgment in its favor and against Defendants jointly for all damages that JEMCO has sustained as a result of Defendants' intentional interference with JEMCO's business relations.

**COUNT 3 – VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES ACT**

69. Defendants violated the Louisiana Unfair Trade Practices Act ("LUTPA," La. R.S. 51:1401, *et seq.*) by attempting to force Comeaux to give Defendants Ward and Locas 50% of JEMCO's business, then maliciously interfering with JEMCO's business relations when Comeaux refused that demand.

70. In doing so, Defendants used or employed unfair or deceptive methods, acts, and practices declared unlawful by R.S. 51:1405.

71. JEMCO has sustained an ascertainable loss of money and property due to Defendants' use or employment of unfair or deceptive methods, acts, or practices declared unlawful by R.S. 51:1405.

72. JEMCO asks for judgment in its favor and against Defendants jointly for all damages that it sustained as a result of Defendants' use or employment of unfair or deceptive methods, acts, or practices declared unlawful by R.S. 51:1405, along with all penalties available and warranted under the LUTPA, plus attorney's fees incurred for bringing this action, all as allowed under the LUTPA.

---

## JURY DEMAND

73.     JEMCO prays for a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff JEMCO Enterprises, LLC respectfully prays that after due proceedings are held, that the Court enter judgment in JEMCO's favor and against Defendants jointly and severally:

a. Permanently enjoining Defendants Wildcards Productions, LLC, Ward, Garth, and Locas, along with their agents, affiliates, representatives, and anyone associated with them, from interfering with JEMCO's business, complaining that JEMCO's use of the LWA logo infringes on Defendants' intellectual property rights, attempting to interfere with JEMCO's social media pages, attempting to interfere with JEMCO's efforts to market merchandise with the LWA logo, and attempting to interfere with JEMCO's use of equipment with the LWA logo on it;

b. For all damages that JEMCO has sustained and will sustain as a result of Defendants' intentional interference with JEMCO's business relations;

c. For all monetary losses and losses of property that JEMCO has sustained and will sustain as a result of Defendants' violations of the LUTPA, plus all penalties due under the LUTPA, and attorney's fees that JEMCO incurred as a result of those violations; and

d. Any and all other relief found due and owning under these premises.

Respectfully Submitted,

**OATS & MARINO**
**A Partnership of Professional Corporations**

*/s/ Daniel J. Phillips*
**LAWRENCE E. MARINO (#23206)**
**DANIEL J. PHILLIPS (32921)**
100 E. Vermilion Street, Suite 400
Lafayette, LA 70501
Telephone: (337) 233-1100
Facsimile: (337) 233-1178
Email: lmarino@oatsmarino.com
dphillips@oatsmarino.com

**ATTORNEYS FOR PLAINTIFF,**
**JEMCO Enterprises, LLC**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| JEMCO ENTERPRISES, LLC<br>    Plaintiffs,<br>v.<br><br>WILDCARDS PRODUCTION, LLC,<br>JEAN-CLAUDE LOCAS, MATTHEW<br>GARTH, and JAMIE WARD<br>    Defendants. | No. _____<br><br>JUDGE<br><br>MAGISTRATE JUDGE |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### VERIFICATION

**STATE OF LOUISIANA**

**PARISH OF LAFAYETTE**

BEFORE ME, the undersigned authority, personally came and appeared

JOEY R. COMEAUX

who, after being duly sworn, did depose and say that:

1.

He is the Manager/Member of JEMCO Enterprises, LLC.

2.

That he has read the above and foregoing Verified Complaint and it is true and correct to the best of his knowledge, information and belief.

3.

That he has personal knowledge of all events set forth therein through his role as member and manager of JEMCO Enterprises, LLC.

_____
Joey R. Comeaux, Manager/Member
JEMCO Enterprises, LLC

SWORN TO AND SUBSCRIBED before me, notary public, this 29th, day of _____May_____, 2025.

_____
Notary Public
Bar Roll/Notary Id No._____



DANIEL J. PHILLIPS
NOTARY PUBLIC
BAR NO. 32921
STATE OF LOUISIANA
Commission Expires at Death